**E-Filed 3/18/10**

# IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

TMX FUNDING, INC., a Delaware corporation,

Plaintiffs,

v.

IMPERO TECHNOLOGIES, INC., A California Corporation; CLARENCE NICHOLAS STEIGELMAN, An Individual; RONALD J LESNIAK, An Individual; MITCHELL A HEINLEIN, An Individual; JOSEPH ZHANG, a.k.a. XIANGCHOU ZHANG, An Individual; MICHELLE DOVER, An Individual; And DAVID LESNIAK, An Individual,

Defendants.

Case Number C 10-00202 JF (PVT)

**ORDER[1] GRANTING MOTION FOR PRELIMINARY INJUNCTION**

On January 14, 2010, Plaintiff TMX Funding, Inc. ("TMX") filed the instant action against Defendants Impero Technologies, Inc., Clarence Steigelman, Ronald Lesniak, Mitchell Heinlein, Joseph Zhang, Michelle Dover, and David Lesniak ("Defendants"), asserting several claims for relief including misappropriation of trade secrets in violation of the California

---

[1] This disposition is not designated for publication in the official reports.

1    Uniform Trade Secrets Act ("UTSA"), Cal. Civ. Code § 3426.1; interference with prospective

2    economic advantage; breach of contract; unfair competition in violation of Cal. Bus. & Prof.

3    Code § 17200, et seq.; and conversion in violation of Cal. Penal Code § 502(e). On January 20,

4    2010, Plaintiffs moved for a temporary restraining order ("TRO") and an order to show cause

5    why Defendants should not be enjoined from unlawfully taking, retaining and utilizing property

6    and confidential, proprietary, and/or trade secret information allegedly belonging to TMX. On

7    January 29, 2010, the Court denied the request for a TRO.  The Court now considers TMX's

8    request for a preliminary injunction.

9                                    **I.  BACKGROUND**

10        TMX is the purchaser of certain assets and collateral of Teledex LLC ("Teledex"), a

11   designer and manufacturer of hotel guest room telecommunication solutions, including wireless

12   broadband internet, analog telephone, and voice-over internet protocol telephone systems. On

13   December 7, 2009, TMX acquired a first priority secured loan in the approximate principal

14   amount of $58 million. Teledex was a borrower on the loan, which was secured by various

15   security agreements that granted TMX a security interest in substantially all of the assets of the

16   borrowers ("Collateral"). Under the terms of the security agreements, the Collateral included

17   "all General Intangibles (including all customer lists, intellectual property rights, trade secrets,

18   proprietary or confidential information, inventions, technical information, procedures, designs,

19   rights under any contract, all payment intangibles, and Software)" as well as all Accounts,

20   Documents (including Teledex's patent, trademark, and copyright security agreements), and

21   Goods (including inventory and equipment). *See* Pl.'s Mem. P. & A. in Support of Ex Parte

22   Application for TRO, 3:6-21; Quiros Decl., Ex. 3.

23        The borrowers executed numerous forbearance agreements, the last of which expired on

24   December 7, 2009 at 5:00 p.m. TMX immediately entered into an Assignment and Agency

25   Transfer Agreement pursuant to which it paid for and acquired the loan from the other lenders,

26   becoming their successor in interest and retaining all of the rights and remedies under the loan

27

28

                                            2

1  documents.[2] On December 8, 2009, TMX filed suit in the Santa Clara Superior Court, seeking

2  appointment of a receiver, issuance of a TRO and injunction, and foreclosure of the Collateral.

3  On December 9, 2009, the Superior Court appointed a receiver and issued a TRO ordering all

4  agents, officers, and employees of Teledex not to "do any act which will, or would tend to,

5  impair, defeat, divert, prevent or prejudice the preservation of the Receivership Estate's assets."

6  Pl.'s Mem. P. & A. in Support of Ex Parte Application for TRO, 4:20-28; Dwyer Decl., Ex. 2.

7  The Receiver took possession and control of Teledex business operations on December 9, 2009

8  and entered the business premises early on December 10, 2009.

9  According to TMX, on December 12, 2009 the Receiver notified Teledex employees in a

10  written memorandum that he had been appointed by the Superior Court to preserve, operate, and

11  maintain the Receivership Property until the foreclosure sale, and requested that the employees

12  continue operating the day-to-day business of Teledex through December 18, 2009. Teledex

13  employees received notices of termination "on or about" December 13, 2009. Lawrence Decl.

14  ¶13; Ex. 4. According to Defendants, however, Teledex employees were terminated

15  immediately because Teledex had been left without funds to pay employee wages. R. Lesniak

16  Decl. ¶9 (stating that he was "forced to terminate [Teledex's] 94 employees" on December 8,

17  2009). The parties dispute whether Teledex employees were subject to the Superior Court's

18  Receivership Order and TRO, which issued on December 9, 2009. *See* Defs.' Supp. Mem. P. &

19  A. in Opp'n, 4:1-14.[3]

20  On December 18, 2009 and January 13, 2010, pursuant to foreclosure sales, TMX

21  purchased the Collateral, including Teledex's business operations and trade secrets. After the

22  foreclosure sales, TMX sent the hardware and property it had purchased to Colorado, where

23

24  
25  ___[2] Defendants claim that TMX arranged for the lender, General Electric Capital Corp., to confiscate all funds from Teledex bank accounts prior to the note sale to TMX, creating the
26  circumstances for TMX to appear in court ex parte the next day and seek a receivership.

27  ___[3] There is some evidence that a memo to all employees from Teledex CEO Ron Lesniak regarding employee termination was written on December 9, 2009, the same day that the
28  Receivership and TRO went into effect. *See* Lawrence. Decl., Ex. 4.

1 former Teledex employees working for TMX conducted an inventory. TMX alleges that during

2 this transitional period computers went missing, account passwords were changed, certain

3 network systems were damaged, and "virtually all of the data, coding and information necessary

4 for TMX to operate the former business of Teledex [was] removed, erased and/or overwritten by

5 the Defendants." Pl.'s Mem. P. & A. in Support of Ex Parte Application for TRO, 12:20-22. On

6 December 17, 2009, the Receiver filed a report with the San Jose Police Department related to at

7 least five missing computers.

8       On December 14, 2009, Defendants Steigelman, Zhang, and Heinlein formed Defendant

9 Impero Technologies ("Impero") so that they could continue working in their field of choice.

10 Defendants Ronald Lesniak, David Lesniak, and Michelle Dover are not involved with Impero.

11 TMX alleges that Defendants have engaged in the misappropriation and use of confidential,

12 proprietary, and trade secret information, principally by communicating with and attempting to

13 generate business from the same customers for which they were responsible while they were at

14 Teledex. TMX has filed declarations containing extracts of email exchanges between individual

15 Defendants and contacts for former Teledex customers, and it alleges that Defendants could not

16 have established ties to these customers so quickly without using TMX's confidential client

17 information and proprietary business plans and strategies.

18       Defendants claim that during the transitional period, TMX failed to meet the needs of

19 numerous Teledex clients, several of which reached out to Defendants for help. Defendant

20 Steigelman declares that in at least once instance he referred a customer back to TMX, stating

21 that he could not answer any questions about Teledex products. *See* Steigelman Decl., Ex. C.

22 Defendants deny sabotaging computer systems or removing documents and equipment. They

23 point to a free giveaway of Teledex property, advertised on Craigslist on December 31, 2009

24 (presumably after TMX shipped the Collateral to Colorado), in which one Defendant saw people

25 "emptying file cabinets with files in them" and noted there were "telephone and Expressnet

26 products ... available for the taking." Defs.' Mem. P. & A. in Opp'n, 5:7-11; Steigelman Decl.

27 ¶37. Defendants also argue that they reasonably believed they could keep their Teledex personal

28 laptops, based both on Teledex's company policy and on Ronald Lesniak's decision to allow

1    employees to keep their laptops since Teledex had no way to pay them. R. Lesniak Decl. ¶10.

2         TMX seeks to enjoin Defendants from: (1) destroying, incapacitating, corrupting,

3    retaining, and/or failing to return to TMX any of its hardware (including but not limited to

4    laptop computers, tower computers, desktop computers, servers, and hard drives) and software;

5    (2) destroying, incapacitating, corrupting, retaining, and/or failing to return to TMX any of its

6    Confidential Information, Proprietary Information and/or Trade Secret Information relating to

7    the business of Teledex LLC, (including: (a) the service feedback, service history, account

8    profiles, buying needs, patterns, habits and/or preferences of Teledex's customers; (b) research

9    and development data, product data, source codes, passwords and service information; (c)

10   business methods and/or plans, such as prospective customers and sales methods for attracting

11   and retaining customers; (d) customer lists; (e) product information, including, but not limited to

12   pricing and service data; (f) the customer contact names and any information pertaining to the

13   accounts the individual Defendants serviced while at Teledex; (g) the identity and contact

14   information of the person(s) with purchasing authority and/or persons with influence over

15   purchasing decisions for the accounts the individual Defendants serviced while at Teledex; (h)

16   any document that originated from Teledex or contains information that was derived from

17   information that originated from Teledex; (3) accessing any computer networks, databases,

18   servers, telephone systems and 800 telephone numbers belonging to TMX; (4) using, copying,

19   divulging, disseminating, erasing, or otherwise misappropriating any Proprietary Information,

20   Confidential Information and/or Trade Secret Information belonging to TMX, whether obtained

21   from TMX's or Teledex's computers, networks, servers and/or databases or obtained by other

22   means; (5) contacting, communicating, or doing business with any of the customers or their

23   representatives whom the individual Defendants had contacted, solicited or serviced while at

24   Teledex by using Proprietary Information, Confidential Information and/or Trade Secret

25   Information belonging to TMX; and (6) selling, attempting to sell, or offering for sale any TMX

26   products or services bearing the Teledex brand name including but not limited to internet

27   services, high speed internet services, voice over internet protocol telephones, and network data

28   products.

Case Number C 10-00202 JF
ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION
(JFEX2)

1  TMX also seeks to compel Defendants immediately to return: (1) any hardware
2  (including but not limited to laptop computers, tower computers, desktop computers, servers,
3  and hard drives) and software belonging to TMX and/or that was removed and taken from
4  Teledex; and (2) Confidential, Proprietary and/or Trade Secret Information relating to the
5  business of Teledex LLC, including: (a) the service feedback, service history, account profiles,
6  buying needs, patterns, habits and/or preferences of Teledex's customers; (b) research and
7  development data, product data, source codes, passwords, and service information; (c) business
8  methods and/or plans, such as prospective customers and sales methods for attracting and
9  retaining customers; (d) customer lists; (e) product information, including, but not limited to
10 pricing and service data; (f) the customer contact names and any information pertaining to the
11 accounts the individual Defendants serviced while at Teledex; (g) the identity and contact
12 information of the person(s) with purchasing authority and/or person(s) with influence over
13 purchasing decisions for the accounts the individual Defendants serviced while at Teledex; (h)
14 any document that originated from Teledex or which contains information that was derived from
15 information that originated from Teledex, belonging to TMX and/or that was removed and taken
16 from Teledex.

17  The Court has considered the moving papers, supplemental briefs, declarations and
18 exhibits, and the oral arguments of counsel presented at the hearing. For the reasons discussed
19 below, the Court will grant a narrowly tailored preliminary injunction and will require TMX to
20 post a bond of $25,000.

21              **II. LEGAL STANDARD FOR PRELIMINARY INJUNCTIVE RELIEF**

22  A preliminary injunction is "an extraordinary remedy that may only be awarded upon a
23 clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Res. Def. Council,*
24 *Inc.*, 129 S.Ct. 365, 376 (2008). A party seeking a preliminary injunction must show, "[1] that
25 [it] is likely to succeed on the merits, [2] that [it] is likely to suffer irreparable harm in the
26 absence of preliminary relief, [3] that the balance of equities tips in [its] favor, and [4] that an
27 injunction is in the public interest." *Indep. Living Ctr. of S. Cal., Inc. v. Maxwell-Jolly*, 572
28 F.3d 644, 651 (9th Cir. 2009), quoting *Winter*, 129 S.Ct. at 374. The issuance of a preliminary

6

1    injunction is committed to the discretion of the District Court. *Indep. Living Ctr.*, 572 F.3d at

2    651. "To the extent that our cases have suggested a lesser standard, they are no longer

3    controlling, or even viable." *Am. Truckin Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046,

4    1052 (9th Cir. 2009).

5                                    **III. DISCUSSION**

6            **(1) Likelihood of Success on the Merits**

7            Although the merits of this case are disputed by the parties, the Court concludes that

8    TMX has presented sufficient evidence to demonstrate its likelihood of success on the merits

9    with respect to at least some of its asserted claims.

10            **A.  Existence of Proprietary Information or Trade Secrets**

11            Under the Uniform Trade Secrets Act ("UTSA"), a "Trade secret" is information

12    including a "program, device, method, technique, or process, that: (1) Derives independent

13    economic value, actual or potential, from not being generally known to the public or to other

14    persons who can obtain economic value from its disclosure or use; and (2) Is the subject of

15    efforts that are reasonable under the circumstances to maintain its secrecy." Cal. Civ.Code §

16    3426.1(d). A court considers the "time and effort" a company has spent "identifying customers

17    with particular needs or characteristics," in contrast to general customer information which may

18    be "'readily ascertainable' through public sources." *Morlife, Inc. v. Perry*, 56 Cal. App. 4th

19    1514, 1521 (1997). A company's characterization of information as "trade secret" or

20    "confidential," either by marking such information as such, or informing employees through

21    employee agreements and employee handbooks that the company considers the information to

22    be valuable and confidential is also an "important factor in establishing the value which was

23    placed on the information." *Id.* at 1521-22 (citations omitted).

24            TMX has shown that Teledex took steps to protect and maintain the secrecy of certain

25    customer information and business plans and strategies by implementing a Proprietary

26    Information and Employee Inventions Agreement and a Confidential Information Policy and

27    Agreement ("Information Agreements"). Pl.'s Mem. P. & A. in Support of Ex Parte Application

28    for TRO, 6:19-8:1; Lawrence Decl. ¶¶9-12, Ex. 2, 3.  These agreements identified the

                                                    7

proprietary information and defined employees' duties to keep in confidence and trust all proprietary information, to return materials upon termination of employment, and to prevent disclosure and dissemination of confidential and trade secret information to third parties. Teledex also implemented password-protected access to its computers and networks. Through the Teledex loan acquisition on December 7, 2009 and the purchase of Teledex's assets at foreclosure sales on December 18, 2009 and January 13, 2010, TMX expended millions of dollars to acquire Teledex's Collateral, including the categories of confidential, proprietary, and trade secret information covered by the company's own Information Agreements. TMX argues persuasively that the laptop computers still in the possession of several Defendants, as well as other material allegedly accessed and/or retained by Defendants, contain such proprietary and confidential information. *See Western Directories, Inc. v. Golden Guide Directories, Inc.*, 2009 WL1625945 at *5 (N.D. Cal. June 8, 2009) (considering "the primary contact at each customer ... the customer's payment terms; where and how frequently that customer [used the services] ...; and the customer's personal information" to be trade secret information). *See also Courtesy Temp. Serv., Inc., v. Camacho*, 222 Cal. App. 3d 1278, 1287-88 (1990) (holding the "work effort" expended to acquire and retain customers to be a "protectable trade secret" because the "nature and character" of customer information was "irrefutably of commercial value," even if customer names could be found elsewhere).

Defendants' showing to the contrary is unconvincing. Defendants argue that because Teledex publicized or shared with third-party vendors most of the information at issue, including customer lists and product pricing information, none of the information constitutes trade secrets. *See* Defs.' Supp. Mem. P. & A. in Opp'n, 6:7-19. While it is true that publicized or "readily ascertainable" identity of customers, as well as product and pricing information, cannot constitute a protectable trade secret, the information to which Defendants have access on the Teledex laptops is more detailed and is likely to include specific contacts for customers, past communications and agreements between Teledex and customers or vendors, as well as any strategic plans that Teledex developed for its future relationships. This is proprietary information that Teledex invested "time and effort" to create, that is not "'readily ascertainable'

8

1  through public sources," and that Teledex sought to protect through its Information Agreements.

2  *See Morlife, Inc.*, 56 Cal. App. 4th at 1521. Knowledge of such detailed information would

3  provide a business in the same industry with a "substantial business advantage." *See id.* at 1522

4  (citations omitted).

5          Defendants also argue that TMX has not shown that the individual Defendants ever

6  signed the Information Agreements. *See* Steigelman Decl. ¶52, Dover Decl. ¶14, R. Lesniak

7  Decl. ¶2, D. Lesniak Decl. ¶12, Zhang Decl. ¶8, and Heinlein Decl. ¶12 (stating that they do not

8  recall signing or agreeing to be bound by the agreements). However, the question of whether the

9  individual Defendants are bound by the Teledex Information Agreements ultimately does not

10  affect TMX's entitlement to injunctive relief. A trade secret "is the subject of efforts that are

11  reasonable under the circumstances to maintain its secrecy." Cal. Civ.Code § 3426.1(d).

12  Defendants' assertion that they do not recall signing any confidentiality agreement or agreeing to

13  be bound by such is somewhat suspect. Even if the HR Manager in 2000 did not circulate an

14  agreement to all employees already working at Teledex, it is clear that Teledex made other

15  reasonable efforts to protect its trade secrets.

16              **B. Misappropriation**

17          The UTSA defines "Misappropriation" in part as: "(1) Acquisition of a trade secret of

18  another by a person who knows or has reason to know that the trade secret was acquired by

19  improper means; or (2) Disclosure or use of a trade secret of another without express or implied

20  consent by a person who: (A) Used improper means to acquire knowledge of the trade secret; or

21  (B) At the time of disclosure or use, knew or had reason to know that his or her knowledge of

22  the trade secret was: (i) Derived from or through a person who had utilized improper means to

23  acquire it; (ii) Acquired under circumstances giving rise to a duty to maintain its secrecy or limit

24  its use; or (iii) Derived from or through a person who owed a duty to the person seeking relief to

25  maintain its secrecy or limit its use...." Cal. Civ. Code § 3426.1(b).  Under the UTSA, California

26  courts have "equated acts of solicitation with 'use' or 'misappropriation' of protected

27  information." *Morlife, Inc.*, 56 Cal. App. 4th at 1524.

28          TMX alleges that Defendants (specifically Steigelman, Zhang, Heinlein and Impero)

9

misappropriated trade secrets in pursuit of business with several major Teledex customers and vendors. For example, it submits evidence that Teledex and Verdant Technologies were working on a joint business plan in which Teledex would sell and distribute an energy-saving thermostat to its hotel clients. This plan involved communications spanning from August-September 2009 between Defendant Steigelman and a Howard Rosen at Verdant. Lawrence Supp. Decl. ¶4; Quiros Decl., Ex. 12. TMX alleges that Steigelman copied that email chain into a January 1, 2010 email in which he contacted Rosen to pick up where Teledex had left off, unlawfully utilizing the relationship Teledex had built with Verdant to launch Impero. Defendants claim that the Verdant product is available for distribution by any competing distributor. *See* Steigelman Decl. ¶40 (stating that he "communicated with Howard Rosen of Verdant Technologies about the possibility of working with him to distribute Verdant's energy-saving automated thermostat product. I was introduced to Mr. Rosen by Accor (a third party) and knew that Teledex did not have a contract or any commitment to do business with Verdant. I knew that ... Mr. Rosen was looking for multiple opportunities to connect with distributors.")

TMX includes several other examples of email communications between Defendants and Teledex customers and vendor partners which TMX alleges were intended to promote Impero's new business. Defendants deny that any propriety information was misappropriated, claiming that they only have done business with customers who have called or approached them, and who were "no longer beholden to contractual obligations with TMX." *See, e.g.* Heinlein Decl. ¶28.

TMX also alleges that it cannot locate the original, copy, or electronic version of several key contracts, despite having "diligently searched" for the contracts. Quiros Supp. Decl. ¶¶5, 9. One of these missing contracts is between Teledex and Accor, a multinational corporation doing business through a discount U.S. hotel chain. The two-year contract is set to expire in May 2010. TMX alleges that Defendants unlawfully have retained copies of the Accor contract, as evidenced by Defendants' inclusion of copied excerpts from the contract in their exhibits. *See* Defs.' Mem. P. & A. in Opp'n, Ex. B, C. TMX also alleges that Accor signed a contract with Impero on December 18, 2009, "a mere 10 days after the Individual Defendants' employment with Teledex was terminated...." Pl.'s Supp. Mem. P. & A. in Support of Ex Parte Application

10

for TRO 15:21-26. Defendants argue that TMX's foreclosure action terminated the contract by

its own terms, and that Accor had the ability to unilaterally terminate the agreement in the event

Teledex was put into receivership.[4] TMX argues that the Teledex-Accor contract still is in full

force because TMX never received notice from Accor of any desire to terminate. Quiros Supp.

Decl. ¶6.

Taken as true, the evidence in the record does not support Defendants' claims that any

business they have initiated with Impero is the result of their own knowledge and familiarity

with the industry, rather than improper solicitation of Teledex customers. Defendants admit that

they have retained computers belonging to Teledex, and their numerous, documented

communications with the same individuals who were their customer and vendor contacts during

their employment with Teledex make it likely that one or more Defendants has utilized

proprietary information improperly. Defendants' assertion that they have used only the

information located "between their ears" is contradicted by the numerous email chains initiated

by Teledex and "picked up" by Impero employees.

Under the UTSA, knowledge "acquired by an employee by reason of his employment,

may not be used by the employee as his own property or to his employer's prejudice." *Morlife,

Inc.*, 56 Cal. App. 4th at 1526 (citations omitted) (agreeing with former decisions that the

pertinent issue is not whether a defendant must "wipe clean" his memory of customer

information and friendships, but whether defendant's action ignored the "paramount interest in

protecting information meeting the definitional criteria of a trade secret.") *See also Lillge v.

Verity*, 2007 WL 2900568 at * 6-7 (N.D. Cal. Oct. 2, 2007) (finding a serious question as to

misappropriation, but not a strong likelihood of success on the merits, where the record left

unclear "how much of defendants' useful information derives from their own memory and how

---

[4] Defendants point to Clauses 21 and 33 of the Teledex-Accor contract, which address
"Default and Termination" and "Assignment." These clauses appear to require prior written
consent before any assignment of the contract and to void any purported assignment that is
prohibited. In the case of default, which may occur when a Party becomes subject to a court order
approving a creditor's application for appointment of a receiver, the non-defaulting Party has the
right to terminate the agreement. Defs.' Opp'n, Ex., B, C.

11

1    much derives from ongoing access to plaintiff's confidential information"); *Western Directories*,

2    2009 WL1625945 at *5 (N.D. Cal. June 8, 2009) (same). Although California courts rarely will

3    "impose an unconditional prohibition on doing business with customers of the former

4    employer," courts will prohibit "the unlawful use of trade secrets to solicit those customers."

5    *Morlife, Inc.*, 56 Cal. App. 4th at 1524. In this case, the Court need not decide the status of the

6    Accor contract nor need it find that Defendants solicited business from all of the alleged, former

7    Teledex customers or vendors. As just discussed, the evidence is sufficient to support a finding

8    at the preliminary injunction stage that at least some misappropriation of proprietary information

9    has occurred.

10        **(2) Irreparable Harm**

11        Defendants argue that TMX has failed to show that it will suffer any irreparable harm in

12    the absence of a preliminary injunction. They contend that TMX cannot show injury because

13    Impero's business – providing support services for telecommunications to broadband products –

14    is distinct from TMX's role as a manufacturer of hotel telecommunications solutions. Defendants

15    also offer evidence that individual Defendants were approached by TMX with offers of money in

16    exchange for covenants not to compete and claim TMX's real interest is to "corner the market."

17    *See* Heinlein Decl. ¶25, Ex. O; Houle Decl. ¶12. Finally, they argue that the likelihood of

18    irreparable injury to TMX is particularly weak because most of the injury alleged by TMX

19    actually is monetary.

20        TMX claims that Defendants' retention of the missing computers and other materials,

21    such as the Accor contract, continues to interfere significantly with its ability to do business. It

22    argues that having spent millions of dollars to purchase and acquire the business operations and

23    trade secret information of Teledex, the risk of "losing established customers to [D]efendants'

24    new business due to [D]efendants' improper use of ... proprietary information would obviously

25    create lasting, irreparable harm" (quoting *Lillge*, 2007 WL 2900568 at *7 (N.D. Cal. Oct. 2,

26    2007)). TMX also expresses the concern that Defendants will not be able to satisfy a future

27    damages award.

28        The fact that the alleged harm is primarily in the form of lost customers and business

12

1    goodwill, which at least in theory may be compensated by damages, weighs against TMX's claim

2    of irreparable harm. *See Sampson v. Murray*, 415 U.S. 61, 90 (1974) ("The possibility that

3    adequate compensatory or other corrective relief will be available at a later date, in the ordinary

4    course of litigation, weighs heavily against a claim of irreparable harm.") However, California

5    courts have presumed irreparable harm when proprietary information is misappropriated. *See*

6    *Western Directories*, 2009 WL1625945 at *6 (N.D. Cal. June 8, 2009); *Lillge*, 2007 WL 2900568

7    at *7 (N.D. Cal. Oct. 2, 2007). Because TMX has demonstrated a likelihood of success on the

8    merits with respect to its misappropriation claims, it also meets the criteria under California law

9    for a showing of irreparable harm.

10            **(3)-(4) Balance of Hardships and the Public Interest**

11            Defendants argue that they will suffer a far greater hardship than TMX if an injunction is

12   issued, given the hardship they already have endured since losing their positions at Teledex, and

13   because any negative press stemming from the injunction will harm their reputation as a new

14   company. However, Defendants also claim that they have not used and are not using any

15   proprietary information belonging to TMX, in which case a narrowly tailored injunction should

16   not interfere unduly with their ongoing business efforts. The injunctive relief sought by TMX is

17   specific to the use of proprietary information belonging to TMX; it does not extend to

18   Defendants' business activities or to relationships that are not predicated upon proprietary,

19   confidential, or trade secret information belonging to Teledex and TMX. Accordingly, the

20   balance of hardships weighs in favor of TMX. "Equity will to the fullest extent protect the

21   property rights of employers in their trade secrets and otherwise, but public policy and natural

22   justice require that equity should also be solicitous for the right inherent in all people ... to follow

23   any of the common occupations of life." *Continental Car-Na-Var Corp. v. Moseley*, 24 Cal.2d

24   104, 110 (1944). The Court concludes that it may grant the injunctive relief without preventing

25   Defendants from carrying on lawful business pursuits in the telecommunications hospitality

26   industry or interfering with Defendants' right to pursue their chosen occupation.

27                              **IV. Scope of Relief**

28            Based upon the foregoing discussion, the Court will enter an injunction prohibiting

                                                13

1   Defendants from: (1) failing to return the Teledex laptops and any other equipment or materials

2   containing proprietary, confidential, or trade secret information, and (2) soliciting business from

3   customers or third party vendors with whom Defendants had been in communication with during

4   their final six months at Teledex for the purpose of furthering Teledex business. TMX will be

5   required to post bond in the amount of $25,000 to protect Defendants' interests during the

6   pendency of any further litigation.

7   ### V.  DISPOSITION

8         Good cause therefor appearing, Plaintiff's motion for a preliminary injunction is

9   GRANTED as set forth above, conditioned upon posting of a bond in the amount of $25,000.

10   Counsel for TMX shall prepare an appropriate order.

11

12   **IT IS SO ORDERED**

13

14   DATED: March 17, 2010

15                                          _____
                                            JEREMY FOGEL
16                                          United States District Judge

Case Number C 10-00202 JF
ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION
(JFEX2)